Laramore, Judge,
dissenting:
I believe the low-level flights have created not only noise and vibration, but have also created a hazard such as to make plaintiffs’ property practically worthless and hence constitutes a total taking.
*699 I would give judgment to plaintiffs for the total fair market value of the property as just compensation provided plaintiffs surrender title to the Government. Ferrell v. United States, 49 C. Cls. 222; Kugler v. United States, 4 C. Cls. 407.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiffs, Carlyle and Bessie M. Herring, husband and wife, are residents of the State of Florida and are the owners of a tract of land and improvements thereon in lot 2, section 52, township 2 south, range 30 west, in Escambia County, Florida. The land is located on the outskirts of the community of Warrington, about five miles from the city limits of Pensacola, Florida. The property is in the shape of a triangle, having a frontage of 435 feet on Murray Boulevard, which forms the east side of the triangle. The northern boundary is 161 feet and the third or westerly side extends for 437 feet to a point at the southern end of the property. The plaintiffs’ land is bounded on the west by the East Field of Corry Field Naval Auxiliary Air Station, which is a part of the Naval Air Basic Training Command, United States Naval Air Station, Pensacola, Florida.
2. The property was purchased by plaintiffs in an unimproved, wooded state in 1948 for $1,000, title being transferred to them in March 1949. In January 1950 plaintiffs received by quitclaim deed title to a parcel between the original purchase and the eastern boundary of Corry Field, so that thereafter plaintiffs’ property abutted on Corry Field. By July 1949 they had constructed a garage and a small cottage on the property. They occupied the cottage during the building of a larger three-bedroom house on the property which they completed and occupied in December 1949. They also built three or four parking sites for trailers and, in 1950, an addition to the cottage.
3. Corry Field has been in use as an airfield since 1922. It was acquired by the United States in 1927 for flight training purposes, and the present field was dedicated in December *700 1934 and has been, in continuous use since then for training naval air cadets. The national emergency declared in 1939 tripled the number of students in flight training there, so that by 1942 about 500 students were being trained. Training was curtailed in the late stages of World War II and the number of students dropped to 157 by September 1945. In 1948 Corry Field was again designated as an auxiliary air station and, when Korean hostilities began, training was resumed on a scale surpassed only by World War II. At the time of trial (February 1957) all students in training at Corry Field had flown planes solo elsewhere before being transferred there for advanced instruction, although at earlier times students were assigned to Corry Field for primary flight training.
4. Corry Field has an East Field and an adjoining West Field. Each field contains three runways parallel in direction to corresponding runways on the other. The West Field is normally used for landings and the East Field for takeoffs, which results generally in a counter-clockwise pattern of aircraft arrivals and departures. Because of its longer runways the West Field is in greater use than the East Field. The East Field is not used at night because it lacks lighting facilities. The eastern boundary of the East Field adjoins plaintiffs’ property. Generally speaking, Cor-ry Field lacks adequate overrun areas (i. e., stabilized zones at the ends of runways providing a safety factor for abortive takeoffs) because the neighborhood offers little room for expansion.
5. a. Runway 29-11, whose use is alleged to conflict with plaintiffs’ enjoyment of their property, is situated on the East Field and runs in a northwest-southeast direction. Constructed between 1935 and 1937, it is 2,875 feet long, was resurfaced in 1940-41, and has been in constant use since its opening. Its majority use is for takeoffs, and it is used for landings only when the wind is 10 knots an hour or greater. The last 325 feet of its southeastern end slopes downward a total of 3.6 feet and is not used or suitable for use as a takeoff area, but can be used if necessary to avoid a takeoff if a plane is in trouble in taking off. Unlike some other runways at Corry Field, runway 29-11 has no overrun area at *701 the south-eastern end because the short expanse of ground between the end of the runway and the eastern boundary of the reservation is obstructed by a sewage tank, a sewage filter, and a small building which project respectively 11.2 feet, 7.9 feet, and 5.1 feet higher than the end of the runway. An overrun area would be desirable.
b. The plaintiffs knew or should have known at the time they purchased the property described in finding 1 that it adjoined Corry Field and lay only 275 feet from the end of runway 29-11. The plaintiff Carlyle Herring, an aviation chief machinist in the Navy, was stationed at Corry Field in 1946 and 1947, and at the Naval Air Station, Pensacola, about four miles from Corry Field, in 1948 and 1949. He first inspected the property in 1947. Mrs. Herring inspected the property for three or four months before deciding to buy it. Tall trees and dense underbrush growing on the property at the time of the purchase caused aircraft to fly higher and to be somewhat less noticeable prior to purchase than later in 1950 when the tall trees were removed (finding 8 b).
6. a. Since Corry Field has been and is a training field for student pilots, virtually all of the aircraft stationed there have been of the small, single-engine trainer type. Jet-powered aircraft have not used the field. The SNJ, T-28 and T-24, all single-engine trainer-type aircraft ranging from 5,000 to 8,000 pounds in weight and 600 to 1,500 in horsepower, have been in predominant use at Corry Field in recent years and throughout plaintiffs’ ownership of their property, including the time of trial (February 1957). The SNJ, which was the principal trainer-type plane in use from July 1952 to August 1955, has a wing span of 42 feet, uses 1,000 to 1,200 feet of runway to become airborne, takes off at a speed of 60 to 70 knots per hour, climbs at 95 knots per hour or 1,000 feet per minute, and glides at 80 knots per hour. The T-28, which was first stationed at Corry Field in August 1955, is heavier, more powerful and noisier than the SNJ, climbs at 120 knots per hour or 3,000 to 4,000 feet per minute, takes 1,400 feet of runway to become airborne, glides at 100 knots per hour, and reaches an altitude of about 150 feet from 300 to 500 feet from the point of becoming airborne. The T-34 is much slower and quieter than the *702 SNJ and the T-28, and uses less runway to become airborne.
b. For an undetermined period, perhaps starting in 1949 and ending July 1952, a carrier squadron based its fleet type aircraft at Corry Field. These aircraft were fighter planes weighing from 10,000 to 15,000 pounds and delivering 1,800 to 2,000 horsepower. The record supplies no more information concerning them.
7. a. All planes taking off to the east from runway 29-11 start at rest at the northwestern end of the runway. A single plane taking off will usually start at the right side or center of the runway. When a group of planes are to take off in succession they line up in three’s at the end of the runway and take off at close intervals. All planes take off at full power and normally are airborne by the time they are halfway down runway 29-11, or about 1,400 feet from the southeastern end, although sometimes erring pilots will exceed this by 400 to 500 feet. The point on the runway where planes taking off are airborne is not marked and varies with the characteristics of the plane, wind, load, and pilot’s technique. Planes taking off are supposed to proceed in a straight course with the projected center line of the runway until they reach an altitude of 250 feet, before turning, and thereafter a cruising altitude of at least 500 feet above the terrain is required by regulations of the Chief of Naval Operations. Power is reduced as soon as a safe flying speed is obtained after becoming airborne. . deduction of power causes a reduction in noise and vibration.
b. In landing on runway 29-11 from the east planes are supposed to be at an altitude of 150 feet and lined up straight with the center line of the runway projected at a point 800 horizontal feet from the end of the runway. At this point the pilot reduces his power gradually and glides into the runway, touching down at a marked point on the runway 325 feet from its southeastern end. At point of touchdown the engine should be fully throttled down. In landing, student pilots frequently rock the wings of their planes inadvertently at a point over the plaintiffs’ property in an effort to line up properly with the runway while they are gliding in. This instability has not been observed over plaintiffs’ property in the course of takeoffs by student pilots. *703 Sometimes in landing the student pilots find themselves coming in at too low an altitude to enable them to coincide with the touchdown point on the runway, so that, at a point over the plaintiffs’ property, they suddenly apply full power to their engines in order to gain sufficient altitude either to clear an obstacle or to go up around for another approach. Such applications of full power produce a substantial and sudden noise and vibration at points below.
8. a. The minimum safe glide angle governing runway 29-11 at Corry Field is prescribed by the Basic Training Command Regulations at 40 to 1, meaning that no surface obstructions are allowed to project above an angle commencing at a point on the runway 325 feet from its southeastern end and rising one foot vertically for each 40 feet horizontally along the projected center line of the runway. The minimum safe glide angle is not to be confused with the actual heights at which aircraft land and take off over the plaintiffs’ property, but is merely a safety prerequisite in airport construction and operation. There is no flying regulation prescribing the distance above the minimum safe glide angle which planes must maintain in taking off and landing. They are merely required to avoid obstacles in the path of flight. The minimum safe glide angle commences on runway 29-11 at an elevation of 28 feet above sea level. It clears the plaintiffs’ house by 15 feet, their cottage by 18% feet, and the television antenna on top of the house by about seven to nine feet. The projected center line of the runway, which aircraft are to follow in taking off and landing, passes through plaintiffs’ cottage and about 30 feet to the side of plaintiffs’ house. The horizontal distances from the commencement of the minimum safe glide angle on runway 29-11 and the western boundary of plaintiffs’ property, the plaintiffs’ cottage and their house are, 620, 710, and 715 feet, respectively. The southeastern end of the runway is 325 feet closer to these points on plaintiffs’ property.
b. In September 1950, with plaintiffs’ permission, the Navy removed 40 to 50 tall trees from the property which ranged in height up to 50 feet above ground level and projected above the minimum safe glide angle. For the most part the trees were removed from that part of the property *704 between plaintiffs’ house and the Corry Field fence bounding plaintiffs’ property on the west. Prior to their removal the trees had tended to keep aircraft at heights of from 75 to 150 feet above the property in landing or taking off from runway 29-11.
c. On January 4, 1956, plaintiffs gave notice to defendant that, on February 4, 1956, they were going to erect three poles ninety feet tall on their property as an obstacle to planes flying over their property too low en route to or from runway 29-11. On February 2, 1956, the District Court of the United States for the Northern District of Florida, Pensacola Division, in Civil Action No. 683, entitled Carlyle Herring and Bessie M. Herring, husband & wife, v. United States of America, granted a temporary injunction restraining the erection of the poles. The poles were not erected.
9. The height at which aircraft from and to runway 29-11 flew over plaintiffs’ property after the removal of tall trees in September 1950 (finding 8 b) was the subject of sharp variance in the testimony. Defendant’s evidence was that aircraft from and to runway 29-11 pass over plaintiffs’ property at heights ranging from 125 to 175 feet in landing and 75 to 100 feet in taking off, although admitting that occasionally planes might have come close to the trees and houses on the property. Defendant’s evidence was also that planes flying as close to treetops and roofs as plaintiffs’ witnesses testified would be in danger of crashing and such incidents would be immediately investigated. The evidence reveals no record of crashes occurring as a result of contact or near contact with objects on plaintiffs’ property. The plaintiffs’ evidence, consisting of their testimony and the testimony of several persons who had either visited the property or lived there at various times as tenants of plaintiffs, generally described planes as habitually crossing plaintiffs’ property at, or sometimes below, the minimum safe glide angle, which meant a height above ground level ranging from 24.5 feet at the western boundary of the property and 30.5 feet at the eastern boundary. They testified to an assortment of instances, such as planes brushing the tops of trees on the property or lopping off the top of a 32-foot high pine tree, pulling up sharply to avoid hitting the top of the *705 television, antenna atop the house, clearing the roof of the house by five to ten feet, passing between and lower than the tops of two oak trees 32 to 37 feet tall, passing low enough for the pilots to be recognizable to persons on the ground, diving steeply in landing and leveling off at rooftop to glide into the runway, tail wheels barely clearing the sewage tank at the end of the runway 29-11 in landing, and coming in five feet above power lines strung on poles in front of the house. Bearing in mind the natural bias of the parties, the lack of skill of the student pilots, their instincts of self-preservation, the difficulties of gauging heights visually from ground level, the takeoff and landing characteristics of the planes, and the relative topography and descriptions of runway 29-11 and plaintiffs’ property, it is concluded that the instances of aircraft passing within ten feet over any objects on plaintiffs’ property, or below or at the minimum safe glide angle, are valid but rare, that aircraft frequently fly as low as 25 feet above the roof of plaintiffs’ house and 29 feet above the cottage (equivalent to 45 feet above the terrain at those points), but that normally they pass over plaintiffs’ property at heights above the terrain ranging from 100 to 150 feet in landing and 45 to 75 feet in taking off.
10. There are no accurate records of the numbers of takeoffs and landings from and to runway 29-11. Defendant’s Exhibit 41 is a tabulation of total flights from all of the runways at Corry Field, both in the East and West Fields, from April 1951 through November 1956. Based upon the fact that airplanes take off and land into the wind, and a study of the wind directions during the stated period, it is reasonably concluded that 10 percent of the total flight figures represent takeoffs from runway 29-11 and 5 percent represent landings on runway 29-11. From the foregoing it is concluded that during the period from 1951 through 1956 the number of takeoffs and landings from runway 29-11 reached a peak in 1954, that their frequencies in 1951 and 1956 were about equal, that their frequencies during the seven-month period from April through October in 1951 were about 20 percent less than in corresponding periods in the five succeeding years, that daily takeoffs and landings from runway 29-11 averaged 50 during the six years cov *706 ered (excluding Sundays wlien the runway was inactive, nighttime when the East Field is not lighted and not in use, and assuming good flying weather on all other days), that activity is relatively greater during the six months from May through December of each year than from November through April, and that December and January are the only months when flight activity falls off pronouncedly. Plaintiffs were disturbed by low-flying aircraft over their property for the first time in September or October 1951, one year after the tall trees were removed from their property by the Navy (finding 8 b), when fleet-type planes flew at low altitudes over their property. On five separate days in 1956 plaintiffs kept a record of the number of planes flying low over their property en route to or from runway 29-11, and compiled figures of 36 in one hour and thirty-five minutes on January 14, 26 on February 8,17 on August 4,18 on August 6, and 107 on August 7. There would be some planes passing low over plaintiffs’ property almost every day, but the number would vary.
11. a. During the period from the completion of the cottage on plaintiffs’ property in July 1949, until the time of trial in February 1957, the plaintiffs lived on the property in either the house or cottage for various periods totaling at least five and one-half years. They have rented out both the house and cottage at different times to different people during this period. Evidence is imperfect and inconclusive as to the periods when the house and cottage have remained untenanted, but it appears that the house has been vacant up to the time of trial for periods totaling at least four months. There is no evidence as to the record of vacancies in the three or four trailer sites on the property, although in October 1954 the plaintiffs complained to the Navy that the tenants in the cottage and trailer sites were complaining of the noise and danger from low-flying aircraft, and that these disturbances had caused the loss of at least two tenants in the house at a cost to plaintiffs of about $800. Plaintiffs have made complaints to the Navy authorities on frequent occasions before and since.
b. The plaintiffs and several of their witnesses who had been tenants at various times in either the house or the cot *707 tage testified collectively that the noise and vibration from low-flying aircraft created uncomfortable living conditions on plaintiffs’ property, caused them frequently to leave their abodes through fear and apprehension, vibrated dishes from their positions hanging on the walls of the house, made conversations in person or by telephone difficult, and impaired their rest. Plaintiffs testified, without corroborating medical evidence, that the conditions complained of have injured plaintiff Bessie M. Herring’s nervous system almost permanently and ruined her health.
c. Most of the noise and vibration experienced on plaintiffs’ property occurs when planes are taking off from runway 29-11, because they are operating under full power. Frequently planes engaged in landing are required to suddenly accelerate their engines in order to gain altitude over plaintiffs’ property when they find they are inadvertently too low to execute landings, and the noise and vibration produced is a common source of discomfort to plaintiffs. There was some evidence that night flights from and to Corry Field disturbed the rest of occupants of plaintiffs’ property, both because of the noise and aircraft landing lights shining in plaintiffs’ bedroom windows. However, since the East Field adjoining plaintiffs’ property was not lighted and therefore not used for night flying, the night-flying aircraft complained of must have been using the West Field and may have passed in the vicinity of but not directly over plaintiffs’ property, and were much more distant from the property than planes would be in flying to and from the East Field. Disturbances from night flying are concluded not to have been significant interferences with plaintiffs’ enjoyment of their property.
d. Plaintiffs have made unsuccessful efforts to sell their property but can find no purchasers because of its proximity to Corry Field. In 1955 they offered it for sale for $23,000 but were unable to find a purchaser.
12. In September 1950 when, with plaintiffs’ permission.P the Navy removed a number of tall trees from plaintiffs* property which were projecting above the minimum safe glide angle (finding 8 b), nothing was said to plaintiffs concerning the acquisition by the defendant of a flight eas« *708 ment over their property. In 1951 Congress appropriated $5,500 to the Navy for acquisition of so-called avigation easements over properties neighboring Corry Field, but the program was deferred because of insufficient funds. On October 31,1952, the Navy sent to plaintiffs a Draft of Avi-gation Easement Option which proposed to give defendant a continuing right for the passage of aircraft over the property at a height of not less than 25 feet, plus a right to clear all obstructions protruding above that level. Plaintiffs replied on November 4 declining to sign the option but indicating a willingness to sell the property if the Navy desired to buy it. On December 9, 1952, plaintiffs again wrote the Navy, this time not only offering to sell the property to them on a cost basis, but offering in the alternative to sell for $2,000 a 25-foot flight easement terminable upon plaintiffs’ sale of the property. On February 19, 1953, the plaintiffs were advised by defendant that no further action in the matter was being taken, and no agreement was ever reached between the parties.
13. Valuation evidence was received from a Mr. Kirch-maier for plaintiffs and Messrs. Falzone and Hatcher for defendant, each of them an experienced and/or competent appraiser. They agreed that the highest and best use of plaintiffs’ property was and is commercial, but in other respects their methods and conclusions proceeded on such disparate bases that they must be separately reported.
14. Kirchmaier’s appraisal was made as of February 1957 and was based on a conception of the property as commercial with residential improvements. In the absence of aircraft activity overhead he arrived at a total fair market value of $36,900 in the following manner:
a. $29,910 Commercial land value, based on $100 per front foot for northernmost 200 feet frontage and, proceeding southerly, the front foot valuation dwindling successively to $75, $40, and $10 for the next 90, 57, and 88.4 feet, respectively.
b. 16,710 Duplication cost of improvements of $19,770 less $2,660 for seven years depreciation to February 1957.
e. $46,620 Combination of a. and b.
*709 less d. 9,720 Arbitrary reduction to attract purchaser, hypothetically in nature of accelerated depreciation, but more realistically an adjustment to meet market requirements.
e. $36,900 Realizable fair market value February 1957 in absence of aircraft activity.
less f. 4,360 Realizable fair market válue February 1957 under then existing conditions of flight activity which precluded occupancy and limited use to billboard advertising.
g. $32,540 Value of flight easement taken by defendant, or plaintiffs’ damage because of said easement.
In arriving at the above results Kirchmaier was able to report only one sale of property remotely comparable, in Ms opinion, to plaintiffs’ property, although, he stated that he had investigated others which he did not consider relevant. The reported sale, made in 1955, was of commercial property of greater depth than plaintiffs which sold at $100 per front foot, although Kirchmaier did not know whether the price included improvements. Plaintiffs’ property is more shallow than other commercial property in the neighborhood. Although Kirchmaier gave a monthly rental value of $167 to $168 for the improvements on plaintiffs’ property (record supports a total of about $217 assuming all properties rented), in his opinion the rentability of improvements was too uncertain and sporadic to establish a valuation based on capitalization of income.
15. a. Falzone’s appraisal was made as of September 1950, was based on a combined value of the land as commercial land and of the commuted use value of the improvements for seven years ending 1957, after which they should be removed so as to permit construction of a type facilitating the highest and best use of the land as commercial property. His estimates of value were presented in four alternatives, the first on the assumption of no flight easement and the others on alternate assumptions of flight easements at levels of 50 feet, 30 feet, and 20 feet above ground level. The following schedule summarizes Falzone’s recommendations as to the September 1950 value of plaintiffs’ property for commer *710 cial use and for residential use, at the respective flight easement levels shown:

Commercial Residential Easement levels above ground value value

No easement (i. e., no flights)-[1] $10,500 [2] $15,800
50-foot easement- 8,500 11,100
30-foot easement_ 4,100 5,300
20-foot easement- 2,900 3,600
b. In Falzone’s opinion the property is, under the present condition of aircraft activity, unsuitable for residental use, but suitable for certain commercial purposes such as a repair shop where the noise of passing aircraft would not be so detrimental to use. The property is otherwise undesirable for residential purposes because of its location on a fast highway, irregular shape, and its proximity to a commercial area and to odors from an adjacent sewage-disposal plant at the end of Cony Field’s runway 29-11.
16. Hatcher valued the property as of May 1956 at $29,000 as commercial property assuming no aircraft interference, at $25,000 assuming a 30-foot flight easement, and at $7,000 assuming a 20-foot flight easement. The first figure was at the rate of $66 per front foot, and the next figure at $57.50 per front foot, both of them based on and being fairly reflective of comparative sales of commercial property in the neighborhood, with due discount for the irregular and inadequate depth factors affecting the property. The residential value would be much lower. He considered but rejected other methods of valuation, such as cost, income, and gross multiplier methods. The depreciated cost of the property and improvements, after deduction of “observed” depreciation (i. e., accrued visible deterioration rather than “straight-line” percentage depreciation) of $1,910, was $14,855 as of May 1956. To use the property for its highest and best use as commercial property would require removal of the existing residential improvements. Possible commercial uses, in *711 contemplation of a 30-foot flight easement, include any small business which is noisy in operation such as a woodworking or printing shop or a garage, or a drive-in restaurant business catering primarily to an evening trade during hours when aircraft activity is slight. The property would still be marketable, but less desirable, if encumbered by a 20-foot flight easement. There has been a steady increase in commercial property values in the vicinity of plaintiffs’ property since 1949. Although its irregular depth and certain undesirable topographical features such as a marshy area in its southern extremity detract from the commercial value of plaintiffs’ property, it enjoys an excellent commercial location at a point just below the junction of two main highways and would be commercially desirable, were it not for its proximity to aircraft landings and departures.
17. Prior to September 1950 aircraft from runway 29-11 flew over the property from 75 to 150 feet above the terrain, and thereafter aircraft flew over the property at 45 feet above the terrain with sufficient frequency to interfere substantially with plaintiffs’ enjoyment of their property, clearing the house, cottage, and television antenna by 20,16, and 5 to 7 feet, respectively; that sometimes but rarely they flew lower than that; that normally they flew from 45 to 75 feet above the terrain in taking off and 100 to 150 feet in landing; and that these conditions pertain now and will remain for the indefinite future. Prior to September 1950 the fair market value of the property for its most valuable use as a residence was $18,000; that its fair market value thereafter was reduced to $10,500 because of frequent flights of low-flying aircraft overhead which restricted its practical use to commercial purposes; and that the diminution in value caused by the circumstances of the alleged taking was $7,500.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover. It is therefore adjudged and ordered that plaintiffs recover of and from the United States the amount of seven thousand five hundred dollars ($7,500), plus interest thereon at four (4)' percent *712 per annum, from October 1, 1950, to the time of payment, all as just compensation for the taking.
Upon payment thereof, an easement of flight for light, propeller-driven, single-engine airplanes at elevations of not less than 45 feet above the surface of the ground, and higher, will be vested in defendant in perpetuity.

 $4,275 for commuted commercial use value of residential improvements for seven years, plus $6,225 for commercial value of land. Front foot valuation was based on neighborhood sales average of $20 per front foot but was varied upward to $25 because of comparatively superior location of plaintiffs’ property, absent aircraft, then discounted to reflect the irregular and inadequate depth of property for commercial use.

 Depreciated September 1950 value of residential improvements of $13,000, plus $2,800 value of land for residential use, absent aircraft.